**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| JOSEPH ANTONIO, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. AW-05-2982 |
| | * | |
| SECURITY SERVICES OF | * | |
| AMERICA, LLC, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>MEMORANDUM OPINION</u>

Currently pending before the Court are Corporate Defendants' Motion for Summary Judgment (Doc. No. 315), Plaintiffs' Cross Motion for Partial Summary Judgment (Doc. No. 359), Defendant Michael Everhart's Motion for Partial Summary Judgment (Doc. No. 353), Defendant Patrick Stephen Walsh's Motion for Summary Judgment (Doc. No. 320), Defendant Jeremy Daniel Parady's Motion for Partial Summary Judgment (Doc. No. 355), Defendant Aaron Lee Speed, Sr.'s Motion for Summary Judgment (Doc. No. 358), and Defendant Roy T. McCann's Motion for Partial Summary Judgment (Doc. No. 357). The Court has reviewed the entire record, including the pleadings and exhibits, with respect to the instant motions. The Court also held a hearing on these motions on March 16, 2010. For the reasons stated below, the Court will GRANT IN PART and DENY IN PART the Corporate Defendants' Motion for Summary Judgment, DENY Plaintiffs' Cross Motion for Partial Summary Judgment, DENY Defendant Patrick Stephen Walsh's Motion for Summary Judgment, DENY Defendant Jeremy Daniel Parady's Motion for Partial Summary Judgment, DENY Defendant Michael Everhart's

Motion for Partial Summary Judgment, DENY Defendant Aaron Lee Speed's Motion for Summary Judgment, and DENY Defendant Roy T. McCann's Motion for Partial Summary Judgment.

## 1.   FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of the now notorious arson of December 6, 2004, in which five men executed a conspiracy to burn homes, most of which were minority-owned, in "Hunters Brooke," a newly developed neighborhood in Charles County, Maryland. The thirty-two Plaintiffs in this case owned, or had contracted to purchase, houses in this neighborhood and participated in their design. They entered into these purchase contracts with two subsidiaries of Lennar Homes, Inc., U.S. Home Corporation, and Patriot Homes, Inc., (collectively, the "Developer"). The individual defendants in this case, Michael Everhart ("Everhart"), Patrick Stephen Walsh ("Walsh"), Jeremy Daniel Parady ("Parady"), Aaron Lee Speed, Sr. ("Speed"), and Roy T. McCann's ("McCann"), (collectively, "Individual Defendants") have all either been found guilty of, or pled guilty to, serious felony criminal charges in federal court arising from their participation in the arson at Hunters Brooke and have all been sentenced to prison by this Court. Plaintiffs brought this ten-count suit against the Individual Defendants, as well as SSA Security, Inc. ("SSA, Inc."), the security guard company, ABM Industries, Inc. ("ABM"), its parent, and Security Services of America, LLC ("SSA, LLC"), its predecessor (collectively "Corporate Defendants").

The Developer hired SSA, Inc. to provide security services at Hunters Brooke, starting on November 12, 2004, until the fires occurred on December 6, 2004. SSA, Inc. employed Defendant Speed and William Fitzpatrick[1] as security guards to work at Hunters Brooke during this period. Pursuant to the Developer's direction, SSA, Inc. assigned a single security guard to

---

[1] The Plaintiffs never sought to bring in Fitzpatrick as a party to the suit, and Fitzpatrick was never criminally charged in connection with the arson.

monitor Hunters Brooke during non-construction hours, from approximately 6:00 p.m. to 5:00 a.m. In this position, the security guard would station himself in a patrol vehicle at the front of the construction site, prevent unauthorized individuals from entering, and patrol the site periodically.

During this period, Defendant Speed and the other Individual Defendants conspired to burn and damage the homes, and allegedly did so with racial animus against African-American and other minority families who planned to move into the houses. While on duty, Speed created a map of the neighborhood and determined the race of each house owner. Then, on December 3, 2004, while on duty, Speed allowed his co-conspirators to deposit flammable liquids within and around the houses in Hunters Brooke.

On December 6, 2004, the morning of the fires, William Fitzpatrick (an employee of SSA, Inc.) was on duty at Hunters Brooke and left his post early, allegedly before 4:00 a.m. Fitzpatrick has declared that he left his post early because he felt ill, though Plaintiffs indicate that he may have departed early to allow Speed to enter the premises unobstructed. In any case, at 5:12 a.m. he returned his identification light to the SSA Inc.'s office in Waldorf, Maryland.

At some point between midnight and 3:20 a.m. that morning, Defendant Walsh drove to Defendant Parady's house, picked him up, and they then met with the co-conspirators, including Defendant Speed, in a parking lot in Waldorf, Maryland. Fitzpatrick called Speed at 3:20 a.m., and Speed returned his call at 3:21 a.m. Around 4:00 a.m., the arsonists entered the site, and some of them entered the houses, poured accelerants in them, and lit them on fire. The arsonists remained there, pouring additional accelerant, for thirty to forty-five minutes, and saw the homes begin to flame. The Charles County 911 Emergency System received a call reporting the fire at 4:54 a.m. The houses sustained serious damage.

Evidence indicates this arson was racially motivated.  The Individual Defendants had uttered statements indicating they were angry that African-Americans were moving into the area. On the night of the fire, one of the Individual Defendants allegedly painted the words "Black Jokers" on a dumpster.  Additionally, ninety percent of the homes damaged were owned or under contract to African-Americans or other minorities. Finally, one Defendant stipulated that the arson was racially motivated. (Doc. No. 375, Ex. 5, Parady Stip. Facts.)

After the arson, the Developer offered to compensate Plaintiffs, and used insurance proceeds to make repairs. The insurance companies, as the Developer's subrogees, filed a lawsuit in this Court against the Corporate Defendants on July 22, 2005, in which they sought to recover payments they made to the Developer under the Developer's property insurance policies. The Corporate Defendants settled the case by "making a lump-sum payment to the Developer's subrogees and obtained a release of all claims without admitting" liability. (Doc No. 315.) All of the Plaintiffs eventually closed on their house purchase contracts. But, Plaintiffs continue to be haunted by the arson and suffer emotional injuries, which are accompanied by physical injuries in some cases.

On November 2, 2005, Plaintiffs brought this ten-count suit against Individual Defendants, as well as SSA, Inc., ABM, and SSA, LLC. SSA, LLC is a North Carolina limited liability company formed in 1998 to provide security guard services, but ceased to exist as a corporate entity in 2006.  ABM Industries, Inc. is the parent company of ABM Security Services, Inc., a Delaware corporation which acquired SSA, LLC in March of 2004.  SSA, Inc. is a California corporation formed in January 2004 as a subsidiary of ABM to provide security services in states previously served by SSA, LLC.  At the time of the fire, all Maryland business for ABM was handled by its subsidiary SSA, Inc.

Plaintiffs allege all Defendants violated the Fair Housing Act (Count I), Maryland Fair Housing Law (Count II),[2] 42 U.S.C. § 1982 (Count III), 42 U.S.C. § 1985(3) (Count IV), and brought claims of tortious interference with contract (Count IX) and intentional infliction of emotional distress ("IIED") (Count X). Additionally, against the Corporate Defendants, Plaintiffs allege negligence in hiring, training, and supervision (Count V), negligence (Count VI), violations of Maryland Business Occupations and Professions Code (Count VII), and breach of contract (Count VIII).

Corporate Defendants have moved for summary judgment on all Counts of Plaintiffs' Amended Complaint, all Individual Defendants have moved for summary judgment on Counts IV (42 U.S.C. § 1985(3)), IX (tortious interference with contract), and X (intentional infliction of emotional distress), and Defendants McCann, Everhart, and Speed have additionally moved for summary judgment on the Fair Housing Act claim (Count I), the 42 U.S.C. § 1982 claim (Count III), and on the 42 U.S.C. Section 1985(3) claim (Count IV) on a separate ground. After the filing of these motions, Plaintiffs moved for sanctions against Corporate Defendants for spoliation of evidence, and Judge Day issued a Memorandum Opinion and Order pertaining to this Motion on March 30, 2010.

As a preliminary matter, the Court would like to recognize the attorneys for the excellent briefings in this case. This case presents very difficult issues, and the Court has appreciated the novel and nuanced arguments the parties have presented. The Court has found merit in almost all of the arguments the parties have put before it, and because of the strength of lawyering in this case and the sad subject matter, the Court has struggled mightily over its decision.

---

[2] The Court dismissed this claim. (Doc. No. 193.)

## 2.   STANDARD OF REVIEW

Summary judgment is only appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  The court must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence.  *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  When parties file cross-motions for summary judgment, the court must view each motion in a light most favorable to the non-movant.  *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).  To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  While the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences.  *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330-31 (4th Cir. 1998).  Additionally, hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment.  *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

## 3.   ANALYSIS

The Court will first address the Corporate Defendants' and Plaintiffs' Cross Motions for Summary Judgment, and then will separately address the Individual Defendants' Motion for Summary Judgment.

Additionally, while the Court heard arguments with respect to Plaintiffs' Motion for

Sanctions Against Defendants SSA, Inc., ABM, and SSA, LLC, the Court is mindful that the

Motion pertains to discovery, and thus the Court will take into consideration the relevant

portions, if any, of Judge Day's decision on the Motion for Sanctions. The Court will not

determine the full scope of his findings in this Opinion. Indeed, at this point it is unclear what

particular issues that remain would be covered by the adverse inference Judge Day ordered. To

the extent that this case proceeds, the Court may invite the parties to submit briefings on the

effect of the adverse inference. Finally, Judge Day authorized further discovery in this case, and

the Court agrees it is warranted. As such, the Court will permit the parties to submit a revised

scheduling order with respect to the applicable discovery and dispositive motions deadlines.

**A. Corporate Defendants' Motion for Summary Judgment and Plaintiffs' Cross Motion for Summary Judgment**

Corporate Defendants move for summary judgment on all counts in the Amended

Complaint, and on whether ABM and SSA, LLC are proper parties to the suit. The Plaintiffs

cross-move for summary judgment on the issue of Corporate Defendants' liability under the

Maryland Business Occupations Code (Count VII). First, the Court finds that ABM and SSA,

LLC are not proper parties to this suit, and will grant summary judgment on all claims as to

them. Three of the Counts in the Complaint can be properly based on Corporate Defendants'

direct liability: Two of these—the negligence in hiring, training, and supervision claim (Count

V) and the negligence claim (Count VI) are denied summary judgment because issues of material

fact remain pending completion of the limited discovery that has been ordered. Because there is

no issue of material fact that the Plaintiffs were merely incidental beneficiaries of the contract

between SSA, Inc. and the Developer, the Court will grant summary judgment on the breach of

contract claim (Count VIII). The remaining Counts hinge, in part, on a determination of SSA,

Inc.'s vicarious liability for the tortious acts of the Hunters Brooke guards, Speed and Fitzpatrick. The Court finds that as a matter of law, Corporate Defendants are not liable for Speed's preparation for arson, but that issues of material fact remain with respect to their liability for Fitzpatrick's early departure from his post. Because neither SSA, Inc. nor any employee acting within the scope of employment acted with the necessary intent or racial animus, and no other basis for vicarious liability applies, the Court will grant Corporate Defendants summary judgment on the Fair Housing Act claim (Count I), the claim for violation of 42 U.S.C. § 1982 (Count III), the 42 U.S.C. § 1985(3) claim (Count IV), the tortious interference with contract claim (Count IX), and the intentional infliction of emotional distress ("IIED") claim (Count X).[3] The common law vicarious liability analysis also applies to the Maryland Business Occupations and Professions Code (Count VII) as the Court finds it codifies traditional principles of vicarious liability. Thus the Maryland Business Occupations and Professions Code claim remains against Corporate Defendants insofar as they are vicariously liable for Fitzpatrick's early departure from his post.

### i.   ABM and SSA, LLC as Parties

In order for ABM, the parent corporation of SSA, Inc., to be a proper party in this case, the Plaintiffs must demonstrate that there is sufficient cause to pierce the corporate veil.  In many jurisdictions, sufficient cause may be demonstrated by showing a high level of control by the parent over the subsidiary, or showing that the subsidiary is simply an instrument for the parent corporation.  *See, e.g.*, *De Witt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 685-86 (4th Cir. 1975) (noting that Texas, Alabama, South Carolina, and Massachusetts all use

---

[3] In a footnote (Doc. No. 315 at 12 n.6), the Corporate Defendants move for summary judgment on the Maryland Fair Housing Act claim (Count II) for the reasons stated in the Court's Memorandum Opinion granting Defendant Speed's Motion to Dismiss Count II (Doc. No. 192). As the reasons for the dismissal of that claim apply to all parties, the Court dismisses Count II as to all parties.

an instrumentality rule).   "Maryland is more restrictive than other jurisdictions in allowing a

plaintiff to pierce a corporation's veil," however. *Residential Warranty Corp. v. Bancroft Homes*

*Greenspring Valley, Inc.*, 126 Md. App. 294, 309 (Ct. Spec. App. 1999).   Under Maryland law,

the protection afforded a corporate entity will only be disregarded when it is "necessary to

prevent fraud or to enforce a paramount equity."   *Dixon v. Process Corp.*, 38 Md. App. 644, 654

(Ct. Spec. App. 1978).   "Arguments that have urged a piercing of the veil for reasons other than

fraud have failed in Maryland courts." *Residential Warranty Corp.*, 126 Md. App at 307.   While

the Plaintiffs seek an application of a control or instrumentality exception, such an exception has

been explicitly rejected in Maryland.   *See, e.g.*, *Dixon*, 38 Md. App. at 654 ("Appellants'

invocation of the 'instrumentality rule' nevertheless, avails them naught as Maryland law is

crystalline 'that the corporate entity will be disregarded only when necessary to prevent fraud or

to enforce a paramount equity.'") (quoting *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 275

Md. 295, 312 (1975)); *Residential Warranty Corp.*, 126 Md. App. at 307 ("Despite the

proclamation that a court may pierce the corporate veil to enforce a paramount equity, arguments

that have urged a piercing of the veil 'for reasons other than fraud' have failed in Maryland

courts.") (internal citations omitted).

Plaintiffs note several undisputed facts concerning ABM's control over the operations of

SSA, Inc; for example, (1) that ABM owns 100 percent of the voting securities in SSA, Inc.; (2)

that SSA, Inc. does not hold annual board meetings, keep corporate minutes, or conduct its own

auditing; and (3) that all but one of SSA, Inc.'s officers are also officers of ABM.   If this case

had arisen under a different state's laws, Plaintiffs would be correct that this level of control

would be sufficient to justify piercing the corporate veil under the control or instrumentality

exception to the corporate veil doctrine.   However, as noted above, Maryland has not embraced

this exception and liability cannot be attached unless there is fraud or where necessary to enforce a paramount equity. *See Bart Arconti & Sons, Inc.*, 275 Md. at 312. Plaintiffs respond that ABM is actually directly liable, thus removing the need to pierce the corporate veil, for the events surrounding the fire because ABM "involved itself in the day to day operations of its subsidiary in contracting, training, and rehiring employees, and is responsible for the failures in these areas." (Doc. No. 359 at 81.) However, this contention is simply a re-characterization of Plaintiffs' argument for control-based vicarious liability as a case for direct liability. Thus, this Court finds that ABM is not a proper party to this case as Plaintiffs have not shown or pled fraud or a similar inequity.

Corporate Defendants further argue that SSA, LLC, as a predecessor to SSA, Inc., cannot be held directly liable for its hiring and training of Speed and Fitzpatrick. (Doc. No. 368 at 61.) While both Speed and Fitzpatrick were originally hired by SSA, LLC, neither party disputes the fact that they were terminated and forced to reapply for positions with SSA, Inc. (*See id.*; Doc. No. 359 at 8.) Corporate Defendants contend that Plaintiffs' argument would result in the undesirable outcome of permanent employer liability for negligence in the hiring of an employee, even after the employee's termination. Corporate Defendants also assert that SSA, LLC no longer did business in Maryland at the time of the arson and thus that Plaintiffs' argument that SSA, LLC could be held liable as it was still providing security services in other states is factually inaccurate. (Doc. No. 368 at 61.)

Plaintiffs argue that SSA, LLC can be held directly liable because it originally hired Speed as a security guard, and that there are disputed facts with regard to the negligence of this hiring. (Doc. No. 359 at 82.) This original act of negligence in the hiring of Speed and Fitzpatrick is a "but-for" cause of the breaches of duty resulting in the fire, according to

Plaintiffs. (*Id.*) Additionally, Plaintiffs contend that SSA, LLC had operations or employees in the State of Maryland at the time of the fire, insinuating that the activities at Hunters Brooke were actually controlled by SSA, LLC. (Doc. No. 259, Attach. B, ¶ 11.)

Plaintiffs cite no case-law with regard to holding predecessor SSA, LLC liable for any claims against the successor. The facts do not indicate that SSA, LLC was involved with the Hunters Brooke property. As such, any potential issues of vicarious liability from the incident in question on December 6, 2004 should be directed at the successor, SSA, Inc. Although a successor is on notice that allegations of liability-producing conduct against a predecessor might ripen into findings of liability, no such notice could exist for a predecessor to be aware of future bad acts by a successor. *See, e.g.*, *NLRB v. General Wood Preserving Co.*, 905 F.2d 803 (4th Cir. 1990) (finding a successor liable for the unfair labor practices of the predecessor). Thus, SSA, LLC is not a proper party to the suit as the rehiring of Speed and Fitzpatrick by SSA, Inc. breaks any possible chain of causality for SSA, LLC.

      **ii.**    **Negligence in Hiring, Supervision, and Training (Count V), and Negligence (Count VI)**

The parties make various arguments with respect to the applicability of negligence claims in this case. But, because Plaintiffs may discover more information with respect to Corporate Defendants' alleged negligence in hiring, supervision, and training, and other negligence during the additional discovery Judge Day has ordered, the Court will not grant summary judgment at this juncture. As Judge Day indicated in his Memorandum Opinion, Corporate Defendants should not be allowed to benefit from their spoliation of evidence by asserting there are no disputed issues of material facts for negligence claims when Plaintiffs have not received a fair opportunity for discovery on these claims. It seems clear to this Court that any loss of emails, hard drives, and other electronic documents that might have been generated by the Lanham

office, its managers, and corporate supervisors would have been potentially relevant to Plaintiffs'

claims of negligence (Count VI) and negligence in hiring, training, and supervision (Count V).

Thus, this Court denies summary judgment to Corporate Defendants on the issues of negligence

(Count VI) and negligence in hiring, training, and supervision (Count V).[4]

### iii.   **Breach of Contract (Count VIII)**

Defendants argue that the Court should grant summary judgment on Plaintiffs' breach of

contract claim (Count VIII) because (1) there was no express contract between SSA, Inc. and the

Developer and (2) Plaintiffs were not third-party beneficiaries of the contract between SSA, Inc.

and the Developer. "In order to recover on a breach of contract claim, a plaintiff must prove that

two or more parties formed a contract, that the defendant breached the contract, and that the

plaintiff suffered actual damages as a result of the breach." *Parlette v. Parlette*, 88 Md. App.

628, 640 (Ct. Spec. App. 1991) (citations omitted). Defendants contend that Plaintiffs have not

met their burden of showing the existence of a valid contract between the Developer and SSA,

Inc., and note that in fact, the Developer and SSA, Inc. had not reached a contractual agreement,

though SSA, Inc. had begun providing services at Hunters Brooke pending completion of

contract negotiations. (Doc. No. 315 at 45.) Based on the record before the Court, it is clear that

there was no written contract. Plaintiffs' assertion that there was a written contract, based only

on evidence that SSA, Inc. performed services under an agreed-upon schedule, cannot show

otherwise. (Doc. No. 359 at 85.) It is equally clear, however, as it is undisputed that SSA, Inc.

performed security services for Corporate Defendants under an agreement, that there is at least

some dispute of material fact as to whether an implied contract existed.

Defendants next argue that even if there was an implied contract between the Developer

and SSA, Inc., Plaintiffs have failed to make the necessary showing that SSA, Inc. and the

---

[4] This denial is without prejudice to the Corporate Defendants' right to re-file once discovery is completed.

Developer intended that Plaintiffs be the beneficiaries of the contract. Though the parties have not briefed the issue of whether it is possible to show third-party beneficiary status under an implied contract, Plaintiffs have cited a case indicating that an oral contract is sufficient to create a third-party beneficiary. *See Parlette*, 88 Md. App. at 633 (affirming trial court judgment where court allowed testimony of creation of oral contract). Before bringing a claim under a contract as a third-party beneficiary, a person "must first demonstrate 'that the contract was intended for his benefit; and, in order for a third party beneficiary to recover for a breach of contract[,] it must clearly appear that the parties intended to recognize him as the primary party in interest and as privy to the promise. . . .'" *Century Nat'l Bank v. Makkar*, 132 Md. App. 84, 93-94 (Ct. Spec. App. 2000) (quoting *Marlboro Shirt Co. v. Am. Dist. Tel. Co.*, 196 Md. 565, 569, 77 A.2d 776 (1951)). If it is not clear that the contract is intended for the benefit of that person, then the person is merely an incidental beneficiary, and cannot recover for breach of contract. *See id.* ("An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee. In order to recover it is essential that the beneficiary shall be the real promisee; *i.e.* that the promise shall be made to him in fact, though not in form.") (internal quotations omitted).

The record clearly shows that the primary purpose of the contract was to protect the Hunters Brooke construction site at night from intruders. An impartial negotiator of the contract declared as much. (Doc. No. 359, Ex. 14, Gaw Decl. at ¶ 10.) Though Plaintiffs have amply demonstrated that they had vested ownership interests in the homes and thus benefited from the protection of the homes, as the Maryland Court of Special Appeals explained in a similar context, "[i]t is not enough that the contract may operate to [their] benefit." *Century Nat'l Bank*, 132 Md. App. at 94 (internal quotations omitted). Nor can Plaintiffs' argument that because at least two of the Plaintiffs, Derrick Potts and Terri Rookard, as well as Terri Rookard's four

children, had already moved into their homes at the time of the arson, and benefited from the security guard services, the parties intended the Plaintiffs to be the primary beneficiaries of the contract. In sum, because the record shows that the Developer was the primary beneficiary of the contract between SSA, Inc. and the Developer, the Court will grant Corporate Defendants summary judgment on the breach of contract claim.

###### iv.   <u>Maryland Business Occupations and Professions Code (Count VII)</u>

The parties have filed cross-motions for summary judgment on the Maryland Business Occupations and Professions Code Section 19-501 claim. The motions hinge on the question of whether the statute codifies common law vicarious liability principles or holds security guard companies strictly liable for the acts of their on-duty employees.

###### a.   Statutory analysis

The Court believes that both parties have made persuasive arguments respecting the novel issue of the proper construction of this statute. The Maryland Business Occupations and Professions Code governs licensing of security guard agencies. Section 19-501 of the statute provides:

> Agency responsible for acts of employees: A licensed security guard agency is responsible for the acts of each of its employees while the employee is conducting the business of the agency.

Md. Code Ann., Bus. Occ. & Prof. § 19-501 (2004). Plaintiffs argue that Corporate Defendants are strictly liable under this statute for all acts SSA, Inc. employees Speed and Fitzpatrick undertook while on duty. Corporate Defendants move for summary judgment on this claim, on the ground that this statute simply codifies common law principles of vicarious liability, and thus does not hold Corporate Defendants liable for any acts Fitzpatrick and Speed committed outside the scope of their employment. Plaintiffs cross-move for summary judgment on this Count,

asking the Court to adopt a construction of the statute that would hold Corporate Defendants strictly liable for any acts their employees committed while on duty.  Under that interpretation, Corporate Defendants would be liable for any of Individual Defendants' violations of Plaintiffs' civil rights, violations of the Fair Housing Act, negligence, and intentional torts.

No Maryland court has construed this statute, though the Legislature passed it in 1996, and adopted the language at issue in this case from its predecessor, Section 13-601 of the Maryland Private Detectives Act, which was enacted in 1986. Though both parties make compelling arguments in support of their construction, the Court now construes the statute to hold employer security guard agencies liable for any acts of employees that are consistent with common law principles of vicarious liability. Accordingly, the Court grants partial summary judgment to Corporate Defendants on this Count, as the only remaining issue with respect to this Count is the Corporate Defendants' liability for Fitzpatrick's early departure from his post under traditional common law principles of liability.

Principles of statutory construction dictate that this Court must enact the intent of the legislature in interpreting this statute, and should abide by any clear and unambiguous everyday meaning of the plain language of the statute. "The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature. The first step in determining legislative intent is to look at the statutory language and 'if the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, [the Court] will give effect to the statute as it is written.'" *Oaks v. Connors*, 339 Md. 24, 35 (1995) (quoting *Jones v. State*, 336 Md. 255, 261, 647 A.2d 1204 (1994)) (internal citations omitted). Additionally, "[a] plain reading of the statute assumes none of its language is superfluous or nugatory." *Bost v. State*, 406 Md. 341, 350 (2008).

The Court believes that both Plaintiffs and Defendants have presented reasonable interpretations of the plain language of this statute, though Defendants' seems more in line with statutory construction rules. Plaintiffs argue that the statute's language imposes a temporal limitation on liability by providing for liability of the security agency "while" the employee conducts the security guard's business. Defendants, on the other hand, offer another reasonable analysis of the statute, contending that liability under the statute is clearly equivalent to traditional theories of *respondeat superior* or "conduct within the scope of employment or conduct taken on the agency's behalf." (Doc. No. 368 at 16.)

Defendants persuasively argue that Plaintiffs' construction violates the Maryland statutory construction rule against adding or taking away language from the statute because it ignores the statute's express limitation of the agency's liability to the employee's acts that he or she carries out in "conducting the business of the agency." *See Bost*, 406 Md. at 350. According to Defendants, intentional torts are clearly not the "business of the agency," and thus the Court cannot construe the plain language of the statute to impose liability for such acts. The Court finds that both parties have presented reasonable interpretations of the statute, and concludes that the statute is ambiguous.

"If the meaning of the plain language [of a statute] is ambiguous or unclear, to discern legislative intent, the court looks to the legislative history, prior case law, the purposes upon which the statutory framework was based, and the statute as a whole." *Id.* Plaintiffs rely on the legislative history of Title 13 of the Maryland Private Detective Statute as legislative history of Title 19 of the Maryland Security Company Statute, because the relevant language is the same. Maryland Security Guards Act, H.B. 42, 1996 Md. Laws 602 (codified as amended at Md. Code Ann., Bus. Occ. & Prof. § 19.101 *et seq*). In 1996 the Legislature "separate[d] the provisions of

law governing the certification of security guards and the regulation of security guard services from the Maryland Private Detectives Act." (Doc. No. 381, Ex. 1, Legislative History of House Bill 42 from the 1996 Session of the General Assembly of Maryland at 11 (Bill Analysis).) Because the language in Title 19 originally derived from Title 13, the Court finds it may appropriately rely on the legislative history of that statute, despite Defendants' objections.

The Court agrees with Defendants that this legislative history does not support Plaintiffs' contention that with this statute, the legislature intended to hold security agents strictly liable for the acts of employees. In the Introduction to the Report on Senate Bill 968 (the Bill which became Title 13), the Chairman of the Business Occupations Article Committee listed twelve purposes of the bill, mostly pertaining to the licensing of private detectives, and none of which referred to holding security agencies more highly accountable for the acts of employees. (Doc. No. 359, Ex. 83, Report on Senate Bill 968.) Also in that introduction, the Chairman explained the Legislature did not intend to repeal the common law, noting, "for the most part, the proposals under the bill find their basis in actual law and practice and do not deviate substantially from the current law as it now is applied. There is no attempt under the revision to change existing underlying policy." (Doc. No. 359, Ex. 83, Report on Senate Bill 968.)

Additionally, the Court cannot construe the Legislature's failure to respond to the Maryland Association of Contract Guard Services' ("Association") letter or proposed Amendment as evidence of legislative intent, as Plaintiffs request. Plaintiffs contend that the Legislature's failure to change the statute's language in response to the Association's anticipation of the very dispute before the Court today, shows that the Legislature intended to impose strict liability. The Association proposed that the statute include the words "if the acts are within the scope of employment," rather than "while the employee is conducting the business of

17

the agency," to avoid judicial construction of the statute as imposing strict liability, and the Legislature did not do so. The Court recognizes, as the Maryland Court of Appeals explained, "[o]ne form of legislative history useful in determining legislative intent is amendments proposed but later rejected by the Legislature." *State v. Bell*, 351 Md. 709, 721 (1998). But, the cases recognizing this amendment rejection theory have interpreted rejection of bills or amendments proposed by legislators, not lobbyists' letters or informal proposed changes by non-legislators, as Plaintiffs present in this case. The sole case that Plaintiffs cite for the amendment rejection theory, *State v. Bell*, involved rejection of a formal bill. Even a formal bill rejection is not as informative as legislative history, because it is difficult to deduce with any certainty the reasons for the rejection. *See id.* at 721. In this case, one could conclude the legislators rejected the language the Association proposed because they preferred the language they had already created as a codification of the common law, or conclude that they wanted to codify strict liability. The court foresees myriad dangerous possibilities resulting from giving a silent rejection of a lobbyist's suggestions the weight typically reserved for rejection of formal legislative amendments.

Additionally, Maryland courts find, "[i]n construing a statute, it is a long-standing rule of statutory interpretation that the common law will not be repealed by implication. A statute is 'not presumed to repeal the common law further than is expressly declared . . . .'" *Suter v. Stuckey*, 402 Md. 211, 232 (2007) (quoting *Robinson v. State*, 728 A.2d 698, 702 (1999); citing *Lutz v. State*, 172 A. 354, 356 (1934)) (internal citations omitted). "If the common law and the statute are in conflict, however, 'the common law yields to the statute to the extent of the inconsistency, and a statute which deals with an entire subject-matter is generally construed as abrogating the common law as to that subject.'" *Suter*, 402 Md. at 232 (quoting *Lutz*, 172 A. at 355-56). Yet,

when the legislature is silent on the matter, the courts should not read conflicts into a statute such that it abrogates the common law. *Suter*, 402 Md. at 232. A clear conflict between the common law and the statutory scheme must exist for the first exception to the presumption against statutory abrogation of the common law to apply; *i.e.* there must be a situation in which "the provisions of the law cannot be given full effect without derogation from the common law." *Id.* at 233. The second exception to the presumption against statutory abrogation of the common law, when a statute occupies an entire field of law, is exemplified in *Robinson v. State*, 728 A.2d 698 (1999).

Corporate Defendants argue that the Legislature clearly did not intend to abrogate common law with this statute, because the statute's language is entirely consistent with the common law principles of vicarious liability existing at the time of § 13-601's enactment. This is in keeping with the principle that courts should not read conflict into a statute to abrogate the common law. *Suter*, 353 Md. at 232. The wording of Maryland Business Professions and Occupations Code § 19-501 can plausibly be read to mirror the common law, not to clearly conflict with it. Plaintiffs seem to argue that the Legislature intended for this statute to abrogate the common law because there would have been no point to enacting the law had the Legislature simply intended to codify common law. Plaintiffs have not given the Court authority for that proposition, however. Moreover, Maryland's presumption that state statutes enact common law unless they explicitly state otherwise clearly undermines Plaintiffs' argument.

Five other courts have construed similar statutes; three have found these statutes to codify common law principles of vicarious liability. *See Borg-Warner Protective Servs. Corp. v. Superior Court*, 89 Cal. Rptr. 2d 687, 689 (Ct. App. 1999) (construing security guard licensing statute as a codification of common law vicarious liability principles); *Knouse Foods*

19

*Cooperative, Inc. v. Burns Int'l Security Servs., Inc.*, 519 F. Supp. 867, 869 (E.D. Pa. 1981) (same); *Hoover Ball & Bearing Co. v. Pinkerton's, Inc.*, 500 F. Supp. 673, 675 (W.D. Mich. 1980) (same). Two courts have found statutes to hold security agencies strictly liable. *See Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591, 595 (7th Cir. 1985) (construing security guard licensing statute as a imposing strict liability on security guard agency); *Stewart Warner Corp. v. Burns Int'l Security Servs., Inc.*, 353 F. Supp. 1387, 1389 (N.D. Ill. 1973) (same). None of the statutes in those cases are nearly identical to the language at issue in this case, because these statutes all contain "good conduct" language which the Maryland Code does not.

Additionally, the cases that found that the statutes imposed strict liability can be distinguished from this case. The Seventh Circuit found the statute at issue imposed strict liability on a security agency in a similar case in *Simmons*, but relied heavily on the fact that the statutory language was nearly identical to that in *Stewart Warner*, which that court had interpreted to impose strict liability. *See* 353 F. Supp. at 1390. Thus, the court was constrained by the earlier interpretation. Additionally, the Court believes that the absence of the "good conduct" language in Maryland's statute weighs against finding that the legislature intended to impose strict liability on security agencies as the "good conduct" language can easily be interpreted to require a higher standard of liability for the security guard company. The court in the case on which the *Simmons* decision heavily relied, *Stewart Warner*, premised its decision on the plain language of the statute and the fact that the legislature had enacted the statute after a case finding that the security agency was not liable for its employee's intentional torts. Like the *Borg-Warner* court, this Court finds several differences from the situations that the *Stewart* court adjudicated. First, as explained earlier, the Court "cannot presume that our Legislature intended to change the common law because it did not expressly state such an intention." *Borg-Warner*,

89 Cal. Rptr. 2d at 687. Next, Maryland's statute was not enacted in response to the Court's decision, as the *Stewart Warner* court found Illinois' statute had been. *See Stewart Warner*, 353 F. Supp. at 1390 ("The construction urged by defendant would interpret 10b(10) as simply reiterating the common law, thus attributing to the legislature an idle act in adopting 10b(10). In *Apex Smelting Co. v. Burns*, 175 F.2d 978, 981 (7th Cir. 1949), a case involving facts very similar to those here, the court upheld a directed verdict for defendant . . . Section 201-10b was subsequently enacted."). Finally, as described above, codification of common law rules is a common practice in Maryland.

While the Court appreciates the rationale for the interpretation Plaintiffs offer—a security company is best positioned to examine the background of employees and exclude any who display a propensity to commit tortious acts—the Court cannot find a sufficient basis for imposing strict liability in the plain language and legislative intent of this statute. This Count will remain only insofar as the Court finds Corporate Defendants can be held liable under traditional vicarious liability principles.[5]

### b.  Vicarious liability analysis

Under the Court's construction of the Maryland Business Professions and Occupations Code, to determine if Corporate Defendants are liable under the statute, the Court must assess whether common law rules of vicarious liability impose liability upon them. Any liability for Corporate Defendants will thus be premised on a finding that SSA, Inc.'s employees, Speed and Fitzpatrick, acted within the scope of employment, or that SSA, Inc. ratified Speed and Fitzpatrick's actions. Corporate Defendants argue that because Speed and Fitzpatrick's actions prior to the arson were outside the scope of their employment, Corporate Defendants cannot be

---

[5] Depending on further development of this litigation, it may be appropriate for the Court to consider a motion to certify the question to the Maryland Court of Appeals, consistent with Md. Code, Cts. & Jud. Proc. art., § 12-601 *et seq.*

held liable on the ground that Speed and Fitzpatrick acted in the scope of employment, and that

Plaintiffs' other theories of liability—"aided by agency" and ratification—also fail to establish

vicarious liability. First, regarding Defendant Speed, the Court cannot avoid the conclusion that

Defendant Speed's alleged on-duty preparations for the arson fell outside the scope of his

employment as a security guard. Thus, Corporate Defendants cannot be liable for any of Speed's

violations under the "scope of employment" theory of liability. Fitzpatrick's departure from the

Hunters Brooke site may be construed as within the scope of his employment, though not if

abandoned his post to further the conspiracy to commit arson. Additionally, because Maryland

courts do not hold employers vicariously liable merely because the employee was aided in his

agency relationship in committing the tortious acts, the Court cannot hold Corporate Defendants

liable on that theory. Finally, the Court does not believe there is sufficient evidence generated at

this time to support Plaintiffs' claim that Corporate Defendants subsequently ratified Speed or

Fitzpatrick's acts to support vicarious liability of Corporate Defendants.

### 1.  Scope of Employment

Corporate Defendants argue that they are not vicariously liable for the arson-related acts

of their employees, Speed and Fitzpatrick, based on Plaintiffs' "scope of liability" theory,

because the individuals' activities fell outside the scope of their employment.  It is well

established that, under Maryland law:

> "To be within the scope of the employment the conduct must be of the kind the
> servant is employed to perform and must occur during a period not unreasonably
> disconnected from the authorized period of employment in a locality not
> unreasonably distant from the authorized area, and actuated at least in part by a
> purpose to serve the master." *East Coast Freight Lines v. Mayor of Baltimore*,
> 190 Md. 256, 58 A.2d 290, 304 (Md. 1948); *see also Sawyer v. Humphries*, 322
> Md. 247, 587 A.2d 467, 471 (Md. 1991). Many factors are considered, including
> whether the act is one commonly done by such servant; the time, place, and
> purpose of the act; the similarity in quality of the act done to the act authorized;

the extent of departure from the normal method of accomplishing an authorized result; and whether the act is seriously criminal. *Sawyer*, 587 A.2d at 471.

*Silvera v. Home Depot U.S.A., Inc.*, 189 F. Supp. 2d 304, 309 (D. Md. 2002).

Additionally:

> Under Maryland law, "the questions of agency and scope of employment are generally questions for the jury." However, "when the servant's deviation from the strict course of his employment or duty is slight and not unusual, the court may determine as a matter of law that he is still executing the master's business, and if the deviation is very marked and unusual it may determine the contrary."

*Jordan v. W. Distrib. Co.*, 135 F. App'x. 582, 585 (4th Cir. 2005) (quoting *Carroll v. Hillendale Golf Club*, 144 A. 693, 695-95 (Md. 1929); *see also Rusnack v. Giant Food, Inc.*, 26 Md. App. 250, 263-264 (Ct. Spec. App. 1975) (finding that a security guard who hit a customer while off duty, yet on the premises he was supposed to guard, was not acting in the scope of employment).

Under the above standards, it is clear that Defendant Speed's preparations for arson while on duty fall outside the scope of his employment. Speed's motives in preparing for this arson were undisputedly purely personal, and were in direct contravention of his formal duties to protect Hunters Brooke. His activities in preparation for the arson—(1) planting flammable materials in houses, (2) providing access to the site to unauthorized individuals, (3) providing a map of the neighborhood to be used during the arsons, and (4) learning which houses were to be occupied by African-Americans—were plainly in opposition to the protective duties SSA, Inc. hired him to perform as a security guard. (Doc. No. 119, ¶ 59.)  Indeed, SSA Inc. expressly prohibited some of these activities, such as security guard entry into the Hunters Brooke houses, as Speed did to plant the fuel. "The Post Orders provided: … (b) patrol the site to insure there are no unwanted guests; (c) post vehicle at the entrance and check every vehicle upon entering site; . . . (e) no guard is permitted to enter any house." (Doc. No. 315, Ex. 20.) Speed's encouraging unauthorized individuals to enter the site to plant flammable liquids also directly violated such

professional obligations. Similarly, Speed's rendering a map of the neighborhood he guarded, learning the ethnicity of the future occupants of the houses, and distributing this information was purely at his own behest, and these activities clearly undermined SSA, Inc.'s purpose of security provision. Finally, these activities were extreme, unexpected, and renegade, further indicating Speed acted from personal motives.

The fact that Speed was on duty while effecting these preparations does not change their oppositional character. The Court of Appeals of Maryland has explicitly ruled out this logic, explaining: "particularly in cases involving intentional torts committed by an employee, this Court has emphasized that where an employee's actions are personal . . . even if during normal duty hours and at an authorized locality, the employee's actions are outside the scope of his employment." *Sawyer v. Humphries*, 322 Md. 247, 256-57 (1991) (citations omitted). Nor does the fact that Speed's position as security guard gave him access to the premises require a finding that his arson preparations occurred in the scope of his employment. Indeed, the Fourth Circuit's decision upholding Judge Blake's decision in *Jordan*, suggests the opposite conclusion. 135 F. App'x. at 584. In that case, two employees were transporting currency in an armored vehicle on Interstate 95 in Maryland, "pursuant to their duties as drivers and security guards for Western Distributing Company," when they attempted to drive another vehicle off the interstate on numerous occasions, and aimed a shotgun at the driver. *Id.* The Fourth Circuit affirmed that these actions were outside the scope of employment as a matter of law, noting "[w]hile it is true that [the employees] committed these acts while on duty, using the truck and guns provided to them by Western, they were in no way attempting to advance Western's interests." *Id.* Similarly, here, despite the fact that Speed's employment enabled him to be on the Hunters Brooke site, preparation for arson was such a marked and unusual deviation from his employment that as a

24

matter of law, these actions fell outside of his scope of employment, and Corporate Defendants are not liable for them.

Next, whether the Court can determine that as a matter of law, Fitzpatrick was acting outside the scope of his employment when he left his post is a much closer question. Corporate Defendants argue that SSA, Inc. employed Fitzpatrick to maintain his post until the end of his scheduled shift, and that his departure constituted a "frolic," outside the scope of employment. "A variety of factors have been cited as bearing on the determination of whether a particular deviation amounts to a detour or a frolic. 'These factors include the time and place of the deviation, its extent with relation to the prescribed route, whether its motivation is in part to serve the master, and whether it is the usual sort of deviation for servants on such a job.'" *Karangelen v. Snyder*, 40 Md. App. 393, 397 (Ct. Spec. App. 1978) (citation omitted). Corporate Defendants argue that Fitzpatrick's abandonment of his post was a total abandonment and frolic because he did not return, it contravened SSA, Inc.'s purpose in protecting Hunters Brooke, and it was unusual for a security guard to leave his post. Additionally, if Plaintiffs were to prove that Fitzpatrick was part of the conspiracy and that his motive for leaving was to allow the arson to proceed, then his action would even more clearly fall outside the scope of employment.

Plaintiffs have presented enough disputes of material fact to survive summary judgment on the issue of whether Fitzpatrick's negligence in leaving his post was within the scope of his employment. First Plaintiffs state that "Corporate Defendants actually knew and explicitly authorized Fitzpatrick to leave his post early that night—as they had many other nights." (Doc. No. 359 at 51.) Fitzpatrick's declaration states that Bradley Messick, site supervisor, had told him he could leave 30 minutes early that night, and that he actually left a full hour early because he was feeling sick. (Doc. No. 359, Ex. 32, Fitzpatrick Decl. ¶ 13.) Messick confirmed that he

authorized Fitzpatrick to regularly leave thirty minutes early so that he could return SSA Inc.'s

identification lamp. He states:

> [T]hey had an amber construction light that you were supposed to put on top of your car,
> it just a blinker that's here I am [sic]. And there was no place to store it there, and you
> had to drive from Indian Head to Waldorf to store it at Gallery Place.
> SSA wouldn't pay for the extra travel time to do that, so I told him to leave with enough
> time to take it to Gallery Place, and that would be his off time, when he left there.

(Bradley Messick Dep., Feb. 14, 2008, Doc. 359, Ex. 31, 78:1-10.) A jury could conclude that at

least half of Fitzpatrick's early departure was authorized and performed for a business purpose. It

is undisputed that Fitzpatrick called Speed at 5:05 a.m., and then returned his identification light

to the SSA, Inc. corporate office at 5:12 a.m. (Doc. 359 at 25.) In light of the fact that Fitzpatrick

returned to the corporate office to complete his duty of returning the lamp after whatever he did

after he departed his post before 4:00 a.m., a jury could conclude that this departure was merely a

detour.

Next, Plaintiffs argue that because Fitzpatrick allegedly attempted to contact Corporate

Defendants to inform them he needed a replacement while on duty at Hunters Brooke, the timing

and location of Fitzpatrick's actions support the assertion that he was acting within the scope of

his employment. They explain, "[t]hat Corporate Defendants were negligent in failing to provide

a means by which Fitzpatrick could be replaced does not mean that Fitzpatrick acted outside of

his scope of employment when he succumbed to his illness and left his post at Hunters Brooke."

(Doc. No. 359 at 52.) The Court agrees that this evidence is relevant as it indicates that

Fitzpatrick attempted to follow procedures before leaving earlier than planned.

Finally, Plaintiffs argue that it was foreseeable that Fitzpatrick would leave his post.

Insofar as the record indicates that the site supervisor approved Fitzpatrick's early departure, the

Court believes there is evidence upon which the Court may conclude Fitzpatrick's early departure was foreseeable.

Because it is typically a jury question whether an employee's action is within the scope of employment, and because Plaintiffs have presented evidence upon which a jury might conclude his departure fell within the scope of his employment, the Court finds that an issue of fact remains as to whether the Corporate Defendants are vicariously liable for Fitzpatrick's early departure. But, to the extent Plaintiffs allege that Fitzpatrick left early intentionally to facilitate the conspiracy to commit arson, the Court finds those actions fall outside the scope of employment. In sum, the Court believes that the evidence is sufficient to hold Corporate Defendants liable for Fitzpatrick's negligence, but not for any intentional tort.

## 2.  Aided by Agency

Next, Defendants contend that Plaintiffs' second theory of vicarious liability, that Speed and Fitzpatrick were able to commit acts leading to arson by way of their employment and thus Corporate Defendants are liable, fails because Maryland courts do not recognize this theory of liability. Plaintiffs contend that even if the Court finds that there is no dispute of material fact regarding whether Speed and Fitzpatrick acted within the scope of their employment, Corporate Defendants may still be liable if Speed and Fitzpatrick were aided in their actions by the agency relationship with Corporate Defendants. Plaintiffs do not cite to Maryland cases applying the "aided by agency" theory, but rather, refer to the *Restatement of Agency* as the basis for the Court to adopt this theory. "The Maryland Court of Appeals, however, has not endorsed this theory of vicarious liability," however. *Lewis v. Forest Pharms., Inc.*, 217 F. Supp. 2d 638, 659 (D. Md. 2002). Because Maryland does not follow the "aided by agency" theory for determining

27

vicarious liability, the Court will not find Corporate Defendants vicariously liable on an "aided by agency" theory.

### 3. Ratification

Finally, Defendants argue that Plaintiffs have not presented sufficient evidence that Corporate Defendants ratified Speed and Fitzpatrick's acts to establish vicarious liability of Corporate Defendants on that theory. In Maryland, "[r]atification requires an intention to ratify, and knowledge of all material facts." *Progressive Casualty Ins. Co. v. Ehrhardt*, 69 Md. App. 431, 442 (Ct. Spec. App. 1986) (citations omitted). If a principal does not directly state an intent to ratify, such intent:

> may be inferred by words, conduct or silence on the part of the principal that reasonably indicates its desire to affirm the unauthorized act. Circumstances that suggest an intent to ratify include: receipt and retention of the benefits of the unauthorized transaction, and a failure to make a timely disaffirmance of the unauthorized acts.

*Id.* (citations omitted).

The Court finds that Plaintiffs do not point to sufficient evidence to raise a dispute of material fact with respect to whether Corporate Defendants ratified Speed and Fitzpatrick's actions. Plaintiffs contend that Corporate Defendants routinely authorized Fitzpatrick's early departure from his post, failed to discipline him for his negligence in abandoning his post, "actively fabricat[ed] evidence to cover up his early departure, and instruct[ed] Fitzpatrick to lie about the time he left Hunters Brooke and other critical pieces of information when interviewed by federal investigators." (Doc. No. 359 at 60.) But, the record simply does not support these allegations. For the allegation that Corporate Defendants instructed Fitzpatrick to lie to federal investigators, Plaintiffs cite to the criminal case, "*United States v. Fitzpatrick*, at 44-55," and summarize, "there were several discrepancies in Fitzpatrick's statements throughout the

investigation," and to Facts 22, 34 and 35. (Doc. No. 359 at 60 n.36.) These citations do not indicate that Grafton and Lee knowingly instructed Fitzpatrick to lie to federal investigators. Fact 22 pertains to Speed's hiring, Fact 34 pertains to the execution of the conspiracy, and Fact 35 states that Grafton and Lee instructed Fitzpatrick to lie, but then cites only to the affidavit of a special agent from the Bureau of Alcohol, Firearms, Tobacco, and Explosives ("AFT") who never states that Grafton or Lee told Fitzpatrick to lie. In fact, the record indicates that Fitzpatrick lied to Grafton and Lee. For example, supervisor Messick stated in deposition, "from my understanding, where [Fitzpatrick's] problems with [Lee and Grafton] occurred from, is lying about what time he left. He actually did it and tell [sic] the FBI he left on time." (Doc. 359, Ex. 31, Bradley Messick Dep.)

Plaintiffs argue that Corporate Defendants ratified the individuals' acts by allowing Fitzpatrick to leave early, and by allegedly attempting to cover up his departure. (Doc. No. 359 at 60-61.) Plaintiffs also state that a jury could reasonably conclude that Corporate Defendants knew within hours that the fires were the result of arson, that the arsons were racially motivated, and that Speed was one of the arsonists. (*Id.* at 63.) However, the only evidence Plaintiffs cite is one deposition in which an ex-employee of Corporate Defendants states that Corporate Defendants asked him to tell the police that Speed's application had been thoroughly reviewed prior to his hiring, something the employee felt was "a lie." (*Id.* at 62.) Plaintiffs assert that this evidence indicates a cover-up and ratification of the racially motivated actions of Speed, thus allowing for vicarious liability of Corporate Defendants. But, for ratification to occur, a principal must both intend to ratify, and have full knowledge of the facts they are ratifying. The little evidence of a cover-up that Plaintiffs provide falls far short of this hefty requirement.[6]

---

[6] The Court does not believe that the record, up to this point, supports a ratification theory. To the extent that the further limited discovery Judge Day has allowed provides evidence to support a ratification theory, the Court will

Accordingly, the Court does not find any basis for holding Corporate Defendants liable for Speed or Fitzpatrick's actions under a ratification theory.

In conclusion, the Court will grant Corporate Defendants partial summary judgment on the Maryland Business Professions and Occupations code, and allow the question regarding Corporate Defendants' liability under the Maryland Business and Occupations Code for acts committed within the scope of Fitzpatrick's employment, *i.e.* negligence, to remain.

### v. Fair Housing Act (Count I), 42 U.S.C. § 1982 (Count III), 42 U.S.C. § 1985(3) (Count IV)

The Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, 42 U.S.C. § 1982, and 42 U.S.C. § 1985(3) (collectively "civil rights statutes") guarantee persons basic rights to be free from discrimination in connection with their enjoyment of property. The FHA creates a policy of fair housing in the United States, makes it unlawful to "make unavailable . . . a dwelling to any person because of race," 42 U.S.C. § 3604, and prohibits intimidation, coercion or interference with a person in connection with his or her enjoyment of property. *See* 42 U.S.C. § 3617. Section 1982 provides that all citizens, regardless of race, shall enjoy the same right to "inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C § 1982. Finally, Section 1985(3) creates a cause of action for people who have been deprived of rights or privileges by two or more persons acting in a conspiracy with a class-based animus. *See* 42 U.S.C § 1985(3).

Corporate Defendants move to dismiss Plaintiffs' claims under the civil rights statutes on the grounds that Plaintiffs have presented no direct statutory violation, or violation by an employee for which Corporate Defendants could be held vicariously liable. Plaintiffs have presented no evidence indicating that Corporate Defendants directly violated these statutes, and thus the Court cannot find Corporate Defendants liable for any direct violations of these statutes.

consider a motion to reconsider the ratification theory of vicarious liability.

Next, the parties agree that the FHA and § 1982 provide for vicarious liability. See *Meyer v. Holley*, 537 U.S. 280, 285 (2003) (internal citations omitted) (finding "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules"); *Yates v. Hagerstown Lodge No. 212*, 878 F. Supp. 788, 798 (D. Md. 1995) ("Applying common-law agency principles to the instant Section 1981 claim, Moose International may be found liable for the Lodge's and Jenkins' unlawful acts if, as a principal, it had knowledge of the relevant circumstances and authorized, ratified, or approved the intentional conduct."). Although Corporate Defendants argue that § 1985(3) does not allow for vicarious liability because it requires direct participation in a conspiracy, the Court will assume, without deciding, that it does, since the Court will grant the motion for summary judgment on this Count on another basis.

The Court believes that Plaintiffs have failed to establish that Corporate Defendants are vicariously liable for violation of the civil rights statutes. A showing of discriminatory animus is necessary under all three of these statutes. *See Bynum v. Hobbs Realty*, No. 00-1143, 2002 U.S. Dist. LEXIS 21473 at * 11 (M.D.N.C. Feb. 22, 2002) ("To succeed under [Section 1982], a plaintiff must prove discriminatory intent on the part of the defendant.") (citations omitted); *Smith v. Clarkton*, 682 F.2d 1055, 1065 (4th Cir. 1982) (courts consider four factors in determining whether "a violation [of the FHA] has occurred, namely, . . . (2) is there some evidence of discriminatory intent") (citation omitted)); *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995) ("to establish a sufficient cause of action for 'conspiracy to deny equal protection of the laws' under section 1985(3), a plaintiff must prove: . . . persons . . . are motivated by a specific class-based, invidiously discriminatory animus . . .") (citation omitted). A plaintiff may demonstrate a discriminatory animus by pointing to direct or circumstantial evidence of

31

discriminatory purpose. *See Bynum*, 2002 U.S. Dist. LEXIS 21473, at *11. Though Speed's conduct in preparing for the arson clearly indicates a discriminatory intent, the Court has found that his conduct fell outside the scope of employment and was not ratified, and thus cannot provide a basis of liability. Fitzpatrick's conduct, on the other hand, was within the scope of employment insofar as it consisted of authorized early departure from his post to return work property to the corporate office. But, his conduct provides no basis for a finding of discriminatory intent.

The Court has found that Fitzpatrick's action was within the scope of employment only to the extent it was not intended to further the conspiracy to commit arson. Plaintiffs present various facts that they claim raise a dispute of material fact as to whether Fitzpatrick intentionally and deliberately participated in the arson (Doc. No. 359 at 40), including the fact that Speed telephoned Fitzpatrick around 3:00 a.m. and 5:00 a.m. on the morning of the fire. The Court does not believe that these facts contradict ample evidence in the record showing Fitzpatrick abandoned his post because he was ill and was authorized to do so beginning at 4:30 a.m. But, assuming *arguendo*, that Fitzpatrick departed his post early in order to facilitate the arson, his participation in the conspiracy would fall outside the scope of his employment as it would indicate he acted on purely personal motives, betrayed SSA, Inc.'s purpose of security provision, and his activity was extreme and unexpected. An undermining of Fitzpatrick's security guard duties as severe as facilitating arson also clearly falls outside the range of the sort of ulterior racial motivations accompanying acts clearly taken within the scope of employment in the case Plaintiffs reference. *See Mathurin v. Gov't of Virgin Islands,* 398 F. Supp. 110, 117 (D.V.I. 1975) (finding government liability for police officer's use of force under *respondeat superior* while acknowledging police officers probably acted with personal and racial

motivations as well). In sum, if the Court were to find that the record supported the claim that Fitzpatrick participated in the conspiracy to commit arson, then the Court would conclude that as a matter of law, Fitzpatrick's actions fell outside his scope of employment. Instead, the Court concludes that as a matter of law, the record is insufficient to support the conclusion that Fitzpatrick participated in the racially-motivated arson conspiracy.

Thus, because the record provides no basis for holding Corporate Defendants either directly or vicariously liable for violations of these civil rights statutes, the Court will grant Corporate Defendants summary judgment on Plaintiffs' claims under the FHA (Count I), 42 U.S.C. § 1982 (Count III), and 42 U.S.C. § 1985(3) (Count IV).[7]

### vi.   Intentional Infliction of Emotional Distress (Count X)

Corporate Defendants move for summary judgment on Plaintiffs' claim for intentional infliction of emotional distress ("IIED"). With regard to the threshold argument, Defendants argue that emotional distress damages are generally not recoverable for injury to property. (Doc. No. 315 at 40) (citing *Hoffman v. Stamper*, 385 Md. 1, 36 (2005).) Damages for injury to property can only be recovered when the "act occasioning the injury is inspired by fraud, malice, or like motives." (Doc. No. 315 at 40.) Corporate Defendants argue that Plaintiffs cannot show that Corporate Defendants acted with malice in injuring the property. (*Id.* at 40.)

Plaintiffs respond that *Hoffman* permits damages for emotional distress in certain situations where property is involved. (Doc. No. 359 at 93.) Plaintiffs state that Maryland law clearly allows these damages when the injury to property is inspired by malice or like motives. *Id.* (citing *Zeigler v. F St. Corp.*, 235 A.2d 703, 705 (Md. 1967).) Plaintiffs argue the alleged

---

[7] Because the Court finds this ground sufficient to grant summary judgment on this claim to Corporate Defendants, the Court will not address their argument regarding 42 U.S.C. § 1985(3)'s coverage of property rights with respect to them, but addresses this claim with respect to the Individual Defendants. *See infra. p. 41.*

racial motivation of the arson qualifies as malice, thereby allowing them to recover damages resulting from damage to the property. (Doc. No. 359 at 93-94.)

"There is a line of Maryland cases allowing recovery for emotional distress in property damage cases, under certain limited conditions." *Abbott v. Forest Hill State Bank*, 60 Md. App. 447, 455 (Ct. Spec. App. 1984). Ordinarily there is no recovery for mental suffering related to property damage. *Zeigler*, 248 Md. at 226. There are two exceptions: mental suffering inspired by fraud and mental suffering inspired by malice. *Id.* "To recover, the plaintiff must allege either notice of the mental distress on the part of the defendant or that the act was calculated to cause mental distress." *Abbott*, 60 Md. App. at 455-56.

Defendants cite *Hoffman*, for the proposition that physical injury is required for emotional distress claims. However, the court in *Hoffman* distinguishes between the requirement of physical injury and physical impact. *Hoffman*, 385 Md. at 35-36. Physical impact is not required, and under the physical injury requirement the plaintiff must show that the emotional damages are an injury "capable of objective determination." *Id.* at 48. Thus, physical injury has been held to include "depression, inability to work or perform routine household chores, loss of appetite, insomnia, nightmares, loss of weight, extreme nervousness and irritability, withdrawal from socialization, fainting, chest pains, headaches, and upset stomachs." *Id.* at 34-35.[8] It appears that the Defendants are seeking imposition of a higher physical impact threshold than is required by case-law. Thus, the Court does not believe that this claim fails as a matter of law on that basis. This claim against Corporate Defendants fails for another reason, however.

Plaintiffs must show four elements to make a prima facie case of IIED: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must

---

[8] Note that these are not examples of sufficiently severe emotional distress for an IIED claim. These are simply examples of the physical injury necessary to cross the threshold of emotional injuries arising out of property damage.

be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. *See Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611 (1977). A deficiency on any point is fatal to the entire claim. *See Foor v. Juvenile Servs. Admin.*, 78 Md. App. 151, 174-75 (Ct. Spec. App. 1989). The intentional or reckless action prong requires the plaintiff "to prove that the defendant either desired to inflict severe emotional distress, knew that such distress was certain or substantially certain to result from his conduct, or acted recklessly in deliberate disregard of a high degree of probability that the emotional distress will follow." *Foor*, 78 Md. App. at 175.

Corporate Defendants argue that Plaintiffs cannot and have not shown the first requirement of IIED, that is, intentional or reckless conduct by the Corporate Defendants. (Doc. No. 368 at 46.) Defendants note that the only direct conduct alleged by Plaintiffs is a negligent failure to "properly hire, train, supervise and monitor its security guards at Hunters Brooke." (Doc. No. 315 at 41.) This negligence is not enough to pass the standard for intentional or reckless conduct for IIED in Maryland. (*Id.* at 40-41.) Thus, the Court cannot find Corporate Defendants directly liable for IIED.

The Plaintiffs' only response is that the Corporate Defendants can be held liable under the *respondeat superior*, aided by agency, or ratification theories of liability for the intentional acts of employees, including IIED. (Doc. No. 359 at 96.) Because the Court has not found Corporate Defendants to be vicariously liable for any of the intentional acts of Speed, and there is no indication that Fitzpatrick intended to inflict emotional distress by leaving early, the Court must grant summary judgment to the Corporate Defendants on this issue.

### vii.    Tortious Interference with Contract (Count IX)

To make out a prima facie case of tortious interference with contract, "it is necessary to prove both a tortious intent and improper or wrongful conduct." *Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 119 (Md. 1994). Any finding that the Corporate Defendants were negligent would not be sufficient to meet the first requirement to establish this tort and Plaintiffs have not presented a sufficient basis to establish intentional conduct by Corporate Defendants. As the Plaintiffs have not presented sufficient evidence that Corporate Defendants' direct action interfered with their contracts, Corporate Defendants are not vicariously liable for Speed's intentional acts, and to the extent Fitzpatrick's acts are found to be intentional, they would fall outside the scope of his employment, the Court will grant Corporate Defendants summary judgment on this claim.

### B.  Individual Defendants' Motions for Summary Judgment

Defendants Patrick Walsh ("Walsh"), Jeremy Daniel Parady ("Parady"), Roy T. McCann ("McCann"), Aaron Lee Speed ("Speed"), and Michael Everhart ("Everhart") move for summary judgment on Count IV (42 U.S.C. § 1985(3)), Count IX (tortious interference with contract), and Count X (IIED) of Plaintiffs' Amended Complaint. Additionally, Defendants McCann, Everhart, and Speed argue that Plaintiffs have not shown sufficient evidence that their actions were racially motivated, and thus move for summary judgment on the FHA claim (Count I), the 42 U.S.C. § 1982 claim (Count III), and on the 42 U.S.C. Section 1985(3) claim (Count IV), on the ground that there is no dispute of material fact that these Defendants had no racial motivation in committing the arson. All of the Individual Defendants adopt the reasoning and arguments of the Corporate Defendants and Defendant Walsh insofar as they are applicable, and thus the Court

will refer to some arguments that Corporate Defendants make. The Court will deny Individual Defendants summary judgment on all Counts.

      i.      **Tortious Interference with Contract (Count IX)**

All Individual Defendants move for summary judgment on the tortious interference with contract claim on two grounds: Patriot Homes did not breach its contract, and the contract was not for a business purpose. Tortious interference with contract claims can be brought under two scenarios: first, where "a third party's intentional interference with another in his or her business or occupation induces a breach of an existing contract," and second, "absent an existing contract, [a third party] maliciously or wrongfully infringes upon an economic relationship." *Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 117 (Md. 1994) (citations omitted).

The first version of this tort requires a plaintiff to show five elements: "(1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff." *Fowler v. Printers II, Inc.*, 89 Md. App. 448, 466 (Ct. Spec. App. 1991) (citations omitted). Defendants argue that Plaintiffs cannot show the fourth element of the tort—that Patriot Homes breached its contract with any Plaintiff. It is undisputed that Plaintiffs ultimately closed on the purchases of the homes, although in some cases the closing was later than anticipated. Plaintiffs claim, however, that Patriot Homes breached its contracts with Plaintiffs because it failed to deliver the homes in a "workmanlike manner." (Doc. No. 359.) Corporate Defendants respond that they are not liable for workmanship issues because "(a) . . . Plaintiffs had and sought remedies through the warranty process; (b) there is no expert testimony linking any warranty problems to the arson; (c) Plaintiffs' expert on economic loss said that he could not provide sufficient opinion on asset

impairment damages; and (d) the Corporate Defendants have settled with the Developer so they can have no liability for workmanship issues on homes that Plaintiffs did not even own at the time of the fire." (Doc. No. 368.)

While the Court finds these arguments convincing, the Court believes that there are disputes of material fact with respect to the issue of whether the contract was breached and whether a warranty process eliminated the possibility of finding that the contract had been breached. Defendants have not pointed to any overwhelming evidence in the record that indicates that these claims have been resolved, and the Court cannot, on this record, conclude as a matter of law that the contract has not been breached under these circumstances. Plaintiffs, on the other hand, have presented thorough records in the form of Plaintiffs' responses to Interrogatories describing problems with their homes after purchase that could possibly be sufficient to permit a finding that the contracts were breached. (*See* Doc. No. 375, Exs. 24 & 25[9] (describing various problems with the homes at settlement).) Plaintiffs' exhibits indicate, for example, that "siding that had been burned by the fires had not been replaced or repaired" and the "developer never replaced or removed burnt trees and wood from the property." (Doc. No. 375, Ex. 5.) The Court finds that issues of material fact remain regarding whether Defendants caused a breach in the "workmanship" clause of the contract.  (Doc. No. 359, Ex. 14.) In light of the fact that breach of only one clause of a contract is sufficient to make out a claim for tortious interference with contract, *see Trimed, Inc. v. Sherwood Med. Co.*, 977 F.2d 885 (4th Cir. 1992), the Court finds a dispute of material fact remains with respect to this issue.

Nor do any of Defendants' other arguments require granting summary judgment on this Count. Defendants concede that their argument that the contract merged with the deed does not

---

[9] In Doc. No. 378, at page 14, Plaintiffs indicate that these documents are Exhibits 15 & 16, but the Court believes it has identified these documents as Exhibits 25 & 26.

eliminate contract terms that were specifically excluded from merger, as the "workmanship" clause was excluded here.

Defendants' second argument in support of summary judgment is that Plaintiffs cannot make out a claim for the second form of the tort, tortious interference with contractual relations, because the Plaintiffs' agreements to purchase homes had no business purpose. Plaintiffs respond that Maryland courts accept contracts for the purchase of homes by private individuals as having a business purpose consistent with the requirements for bringing this claim. The case-law the parties provide is somewhat contradictory. In *Ward v. 84 Lumber*, 758 F. Supp. 335, 337 (D. Md. 1991), a Court in this district facing the question of whether a personal consumer credit insurance contract had a business purpose, reviewed the scope of this tort, and found that it did not. The Ward court explained, "[s]uch a limitation is consistent with the development of this tort under the common law both of England, whence it originated, and of Maryland. . . . Indeed, the most recent pronouncement on this tort from the Court of Appeals of Maryland speaks of this branch of the tort—where there is no frank breach of contract—specifically in terms of an interference with 'business relationships.'" *Id.* at 337 (quoting *K & K Management v. Lee*, 557 A.2d 965 (Md. 1989)). But, a court in this district recently found contracts for the buying and selling of property to fall squarely within the realm of this tort. *See Abbott v. Gordon*, No. 09-372, 2009 U.S. Dist. LEXIS 68819, at *22 (D. Md. Aug. 6, 2009). That court refused to dismiss a claim for tortious interference with a contract to purchase property for personal use, explaining, "[t]he fact that Plaintiffs may not own a business or may not have purchased the Property as part of their employment does not exclude Plaintiffs from asserting a tortious interference with prospective relations claim. . . . Because the buying and selling of property is a business relation and involves economic rights, the 'lawful business' aspect of this element is satisfied." *Id.* at

*22-23.  The Court finds this a very close question. The history of the tort seems to support

Defendants' contention that it is limited to non-personal contracts. But, given that the *Abbot*

court's interpretation of the tort is plausible and based on the plain language of the requirement

of a business relationship, the Court is not willing to grant summary judgment on this second

form of the tort at this juncture. Thus, the Court will deny Individual Defendants' motion for

summary judgment on the tortious interference with contract claim (Count IX).

      **ii.**      **42 U.S.C. Section 1985(3) (Count IV)**

Individual Defendants argue that the Court must grant them summary judgment on

Plaintiffs' 42 U.S.C. § 1985(3) claim because 42 U.S.C. § 1985(3) does not apply to conspiracies

to interfere with property rights protected under § 1982. Plaintiffs respond that the Fourth Circuit

allows § 1985(3) claims based on the right to purchase and own real property protected by 42

U.S.C. §1982, and that the Individual Defendants base their argument on a narrow interpretation

of a case from the Third Circuit. The Court finds that given this statute's well documented

purpose to prohibit race-based discrimination, no binding contrary authority, and a case from this

Circuit finding a 42 U.S.C. §1981 violation may provide the basis for a § 1985(3) claim, the

Plaintiffs may base their § 1985(3) claim on a violation of 42 U.S.C. §1982.

Section 1985(3) is the successor to the Civil Rights Act of 1871, enacted to protect

federal and constitutional rights of citizens of the United States. The statute provides:

> [I]n any case of conspiracy set forth in this section, if one or more persons engaged therein
> do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby
> another is *injured in his person or property*, or deprived of having and exercising any right or
> privilege of a citizen of the United States, the party so injured or deprived may have an action
> for the recovery of damages occasioned by such injury or deprivation, against any one or
> more of the conspirators.

42 U.S.C. § 1985(3) (emphasis added). Clearly, the plain language of the statute contemplates recovery for injury to property.

In 1971, the Supreme Court reversed a 20-year precedent that § 1985(3) applied only to violations of rights protected from official encroachment, finding that the text required a more expansive interpretation. *See Griffin v. Breckenridge*, 403 U.S. 88, 102-103 (1971). In *Griffin*, the Supreme Court re-construed the statute as protecting only those rights that were legislatively protected from both private and public interference. "In finding that the text required that expanded scope, however, [the Supreme Court] recognized the 'constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law.'" *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993) (citations omitted). The *Griffin* Court found the primary restriction on an over-expansion of the statute would be that a prima facie case would require a showing of class-based discriminatory animus. *Griffin*, 403 U.S. at 102. This restriction was clearly intended by Congress, as revealed in the Act's legislative history.

Thus, "in order to prove a private conspiracy in violation of the first clause of § 1985(3), a plaintiff  must show, *inter alia*, (1) that 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action,' and (2) that the conspiracy 'aimed at interfering with rights' that are 'protected against private, as well as official, encroachment.'" *Bray*, 506 U.S. at 267-68 (citation omitted). Plaintiffs have developed sufficient evidence to meet these criteria, and Individual Defendants do not appear to dispute the fact that Plaintiffs have made out a prima facie case so long as the Court allows the § 1985(3) claim to be based on a § 1982 claim.

The Court acknowledges that the Supreme Court's decision in *Bray* left some ambiguity regarding whether § 1985(3) protects only constitutional rights or federal rights as well. As

another court has explained, the fact that Justice Powell and Justice Stevens concurred separately in *Bray* to take the position that § 1985(3) protects only constitutional rights, indicates that such was not the holding of the case. *See Spectronics Corp. v. TCI/TKR, Inc.*, 17 F. Supp. 2d 669, 671-672 (W.D. Ky. 1998). Additionally, the unique status of §§ 1981 and 1982 as enabling statutes of the Thirteenth Amendment, the Court concludes that § 1985(3) violations may be based on them. *See Witten v. A.H. Smith & Co.*, 567 F. Supp. 1063, 1070-1072 (D. Md. 1983) ("Sections 1 & 2 of the Civil Rights Act of 1866, the predecessors to §§ 1981 & 1982, were enacted pursuant to the Enabling Clause of the Thirteenth Amendment authorizing Congress 'to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States.'") (quoting *Civil Rights Cases*, 109 U.S. 3, 20 (1883)). "Judge Miller's reasoning [in *Witten*] remains sound even post-*Bray*." *Spectronics*, 17 F. Supp. 2d at 671. "The right conferred by § 1981 to be free from private interference in the making and enforcement of contracts arguably is precisely the sort of federal right which would be among the 'few' giving rise to a remedy under § 1985(3)." *Id.*

Plaintiffs cite two cases that indicate that the Fourth Circuit has not ruled out the possibility of a § 1985(3) claim being based on a § 1982 claim. In *Bank Realty*, in an unpublished slip opinion, the Fourth Circuit, after finding a Plaintiff showed sufficient evidence of racial animus to make out a § 1982 claim, stated that the lower court had "erred in dismissing the section 1985 and 1986 claims on that basis." *Bank Realty v. Practical Mgmt. Tech.*, No. 90-2128, 1991 U.S. App. LEXIS 11793, at *11 (4th Cir. June 11, 1991). Thus, though the Fourth Circuit had an opportunity to reject the possibility of a § 1985(3) claim being based on a § 1982 claim, it chose not to. Though both the appellate court and the trial court in *Shaare Tefila Congregation* never reached the question of whether a Section 1985(3) can apply to a Section

1981 violation, the Fourth Circuit certainly left open that possibility. *Shaare Tefila Congregation v. Cobb*, 785 F.2d 523, 527 (4th Cir. 1986) ("The Congregation cannot base its section 1985(3) claim on sections 1981 and 1982, because, for the reasons discussed in the preceding sections of this opinion, it failed to state causes of action under those statutes."). The Court's decision today is consistent with other decisions from this District. In *Witten*, a court in this District found that a § 1985(3) claim could be based on a violation of § 1981. 567 F. Supp. 1063, 1070-1072. As Defendants acknowledge, "'[t]he historic interrelationship of §§ 1981 and 1982 have led courts consistently to construe these statutes in tandem,'" and thus the rationale in that case applies to this case as well. (Doc. No. 315 at 14 (quoting *Pumphrey v. Stephen Homes, Inc.*, No. 93-1329, 1994 WL 150947, at *4 (D. Md. Feb. 24, 1994).)

Despite Defendants' contentions to the contrary, the rationale for the Supreme Court's decision in *Bray* supports this Court's finding that a § 1985(3) claim can be based on a violation of § 1982. While the Supreme Court acknowledged that rights protected against both private and official encroachment were few in number, the Court did not limit those rights beyond the definition it provided. Moreover, the Court noted the possibility of further recognition of rights in that category, stating parenthetically, "we have hitherto recognized only the Thirteenth Amendment right to be free from involuntary servitude, and, in the same Thirteenth Amendment context, the right of interstate travel." *Bray*, 506 U.S. at 278 (citations omitted). The *Bray* Court held abortion did not fit within this category of privately and publicly protected rights "since it is much less explicitly protected by the Constitution than, for example, the right of free speech rejected for such status in *Carpenters*," and it fell within a broader category of right that was clearly not protected under this statute. *Id.* That rationale, however, does not apply in this case.

Defendants give great weight to the Third Circuit's statement in *Brown* that § 1985(3) claims should not be expanded beyond violations of interstate travel or involuntary servitude. *See Brown v. Philip Morris, Inc.*, 250 F.3d 789, 806 (3d Cir. 2001). But this Court finds *Brown* poses no obstacle to this Court allowing Plaintiffs to base a § 1985(3) claim on a § 1982 claim because, aside from being non-binding precedent, that court's statements regarding this issue were dicta. *See Brown*, 250 F.3d at 806 ("We need not, however, resolve the question whether violations of §§ 1981 and 1982 can support a § 1985(3) claim because Black Smokers have failed to state a claim under either § 1981 or § 1982.") This Court will follow precedent in this District to reach the conclusion that the § 1985(3) claim in this case can be based on a § 1982 violation, *see Witten*, 567 F. Supp. at 1070-72, and will accordingly deny Individual Defendants' motions for summary judgment on this Count.

### iii.   Intentional Infliction of Emotional Distress (Count X)

Defendants Walsh and Parady move for summary judgment on the IIED claim on the ground that Plaintiffs have not alleged sufficiently severe emotional distress to meet the fourth prong of the prima facie case of IIED.  Defendant Walsh argues that Plaintiffs must show distress so severe that no reasonable man could be expected to endure it, as Maryland law requires a plaintiff to be unable to function, tend to necessary matters, or to conduct daily activities as a result of the distress in order to make out a prima facie case of IIED.

The Court finds, however, that Plaintiffs have presented sufficient evidence of severe emotional distress to survive Defendants' motions for summary judgment on this issue.  To meet the fourth requirement of the prima facie case of IIED, a plaintiff must be "unable to function" or "tend to necessary matters," but total disablement or inability to attend to all daily activities is not a requirement.  *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 61 (Ct. Spec. App.

1986); *Figueirdo-Torres v. Nickel*, 584 A.2d 69, 74 (Md. 1991) (finding that the distress of systemic hypertension, loss of visual acuity, required hospitalization for severe emotional distress, shock and fright to the nervous system, depression, anxiety, obsession, and impairment of one's ability to form intimate relationships with women was sufficiently severe for an IIED claim).  A psychologist examined the Plaintiffs, ranked the severity of their impairments, and gave many of them ratings of poor, very poor, or grossly impaired in the categories of social relationships, occupational function, and substance abuse.  (Doc. 359, Attachment A.) While the accuracy of such ratings is debatable, it appears Plaintiffs have made enough of a showing to survive a summary judgment motion on this issue.  Here, all of the Plaintiffs have testified to or presented evidence of potentially severe injury. Plaintiffs argue that the majority of the Plaintiffs have been diagnosed with post-traumatic stress disorder, anxiety, depression, marriage problems, and other troubles and their psychiatric evaluations bear out their IIED claims.  (*Id.* at 96; *see also Id.*, Ex. 79-D).

Defendants' contention that the symptoms Plaintiffs allege—being fearful, angry, paranoid, nervous, anxious, suffering from headaches, and having problems sleeping—fall short of the level of severity required for an IIED claim, is not consistent with the full spectrum of Maryland cases. Though in *Simon v. Union Hosp. of Cecil County, Inc.*, the court found tremendous stress requiring counseling, depression, and inability to sleep, to be insufficient to meet the severity threshold for an IIED claim, Plaintiffs have cited cases where injuries have sufficed that were at a similar level of severity to those in this case. 15 F. Supp. 2d 787, 799-800 (D. Md. 1998).  Indeed, the Court is persuaded by the Plaintiffs' response that while Maryland law does require severity of emotional distress, something less than complete emotional disablement is sufficient to satisfy this standard.  (Doc. No. 359 at 94.)  Accordingly, the Court

will deny Defendants summary judgment on the intentional infliction of emotional distress

claim.

      **iv.**    **FHA (Count I), 42 U.S.C. § 1982 (Count III), and 42 U.S.C. Section 1985(3) claim (Count IV)**

As described above, *see supra* p. 30, the civil rights statutes guarantee persons basic

rights to be free from discrimination in connection with their enjoyment of property. Individual

Defendants Speed, Everhart, and McCann posit that the Court must grant summary judgment on

the claims under the civil rights statutes—FHA (Count I), 42 U.S.C. § 1982 (Count III), and 42

U.S.C. § 1985(3) (Count IV)—because Plaintiffs have not presented sufficient evidence of racial

motivation and the FHA does not apply to a third-party arson. Plaintiffs respond (1) Defendants

misstate the evidentiary burdens of proving intent, (2) Plaintiffs have presented direct and

circumstantial evidence that raises a genuine issue of material fact with respect to whether

Defendants' arson was motivated by discriminatory intent, violating the FHA and § 1982, (3)

Defendants have failed to rebut evidence of discriminatory intent, (4) based on direct and

circumstantial evidence, Plaintiffs have raised a genuine issue of material fact that Defendants'

conspiracy to commit arson was motivated by racial animus, violating § 1985(3), and (5) the Fair

Housing Act applies to racially motivated arsons. Plaintiffs present ample evidence from which it

is possible to conclude all three of these Individual Defendants were motivated by racial animus

in participating in this arson, and it is clear the FHA applies in this case. Thus, the Court will

deny all Individual Defendants' motions for summary judgment.

      **a.  Racial Motivation**

Plaintiffs present ample evidence from which it is possible to conclude all three of these

Individual Defendants were motivated by racial animus in participating in this arson. A showing

of racial animus is necessary under all three of these statutes. *See supra* pp. 31-32. As mentioned

above, a plaintiff may demonstrate a racial animus by pointing to direct or circumstantial

evidence of discriminatory purpose. *See Bynum v. Hobbs Realty*, No. 00-1143, 2002 U.S. Dist.

LEXIS 21473 at * 11 (M.D.N.C. Feb. 22, 2002) (citations omitted). If Plaintiffs present

circumstantial evidence, they must satisfy the *McDonnell Douglas* framework for proof. *See*

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817

(1973). "Under the *McDonnell Douglas* proof scheme the plaintiff must first establish a prima

facie case of discrimination. Once the plaintiff establishes a prima facie case, the defendant must

respond with evidence that it acted with a legitimate, nondiscriminatory reason. If the defendant

makes this showing, the plaintiff must then present evidence to prove that the defendant's

articulated reason was pretext for unlawful discrimination." *Murrell v. Ocean Mecca Motel, Inc.*,

262 F.3d 253, 257 (4th Cir. 2001) (citations omitted).

Plaintiffs have presented sufficient direct and circumstantial evidence to raise a genuine

issue of material fact as to whether Defendants' arson was motivated by discriminatory intent.

Plaintiffs' direct evidence first includes Defendant Parady's admission in his plea agreement that

the conspiracy targeted Hunters Brooke because Parady "knew or perceived that many of the

purchasers of the houses in that development were African-American." (Doc. No. 375, Ex. 5,

Parady Stip. Facts.)  Defendants Speed and Everhart asserted the Fifth Amendment privilege as

to all questions pertaining to planning the arson. (Doc. No. 375, Exs. 8 & 9.) Plaintiffs argue that

Speed and Everhart's refusal to testify to confirm or deny critical facts entitles Plaintiffs to an

adverse inference at trial, and thus warrants denial of summary judgment. *See ePlus Tech., Inc. v.*

*Aboud*, 313 F.3d 166, 179 (4th Cir. 2002) ("In a civil proceeding, a fact-finder is entitled to draw

adverse inferences from a defendant's invocation of the privilege against self incrimination.").

Plaintiffs also contend that Speed's admission that he participated in the arson because he was

"resentful about the wealth of the residents who he believed looked down at him and his own limited economic and educational status," is a disguised expression of racial animus. (Doc. No. 375, Ex. 1, Speed Stip. Facts.) It is undisputed that the conspirators took a can of black spray paint with them and painted the words "Black Jokers," which a jury could find to be a racial slur, on a dumpster in the neighborhood. Finally, the conspirators regularly made comments derogating racial minorities. Walsh, in the presence of McCann and Everhart, stated "there's too many n**s moving into Charles County," and "Charles County is starting to end up like P.G. County," which he later explained meant "there's a lot of black people." Speed stated to Everhart and Parady, "n**s must die." They all routinely used racial epithets such as "n**s" to refer to African Americans. The Court finds this evidence is sufficient to raise disputes of material fact as to the racial motivation of each Individual Defendant. Indeed, this evidence is unusually direct evidence of racial animus. Though McCann has stated in deposition that he used these slurs benignly, the Court believes that his motivation for using racial epithets is a question of fact for the jury. At the hearing on this Motion, Individual Defendants urged the Court to consider the evidence against each Defendant separately. The Court now finds that because there is evidence that each Individual Defendant used racial epithets, there is a sufficient issue of material fact with respect to each Defendant's racial motivation. Accordingly, on that ground alone, the Court will deny summary judgment to each Defendant.

Even if there was no direct evidence of racial motivation, Plaintiffs have shown sufficient circumstantial evidence of racial motivation to survive a motion for summary judgment. With respect to the circumstantial evidence, Plaintiffs argue that they have established a prima facie case by showing that the arson was more likely than not based, at least partially, on the Plaintiffs' race. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) ("A prima facie

48

case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.") Plaintiffs have shown (1) they are racial minorities; (2) Defendants knew Plaintiffs were racial minorities; (3) Defendants committed an act of violence against their homes; and (4) Defendants' action interfered with Plaintiffs' rights to purchase their homes.

Defendants have failed to rebut evidence of discriminatory intent, and rather merely attack the credibility of witnesses. Plaintiffs also contend that Speed's "legitimate" nondiscriminatory reason for the arson, that he was disgruntled with the paternity-leave policy, is a pretext. The Court has already found that there is sufficient evidence to raise an issue of material fact as to whether Individual Defendants were motivated by racial animus. Accordingly, the Court finds that Plaintiffs have met their burden of making a prima facie case of discrimination, and Defendants have not presented sufficient evidence to rebut it. Thus, the Court denies Individual Defendants' request for summary judgment on the counts requiring racial motivation—FHA (Count I), 42 U.S.C. § 1982 (Count III), and 42 U.S.C. § 1985(3) (Count IV).

### b.  Applicability of FHA

Defendant Speed argues that courts in the Fourth Circuit have not recognized a civil claim under §§ 3604 and 3617 of the FHA outside the context of traditional housing discrimination. Plaintiffs respond that the Supreme Court recognizes that the "broad and inclusive" language of the FHA requires a "generous construction" of the statute, and the plain language of the statute prohibits arson by making it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by section . . . 3604 . . . ." 42 U.S.C. §§ 3604(a), 3617. Courts in the Fourth Circuit have interpreted the FHA to prohibit racially motivated violent property damage. *See Johns v. Stillwell*, No. 07-

49

63, 2009 U.S. Dist. LEXIS 43330 at *22 (W.D. Va. May 20, 2009) ("[A] reasonable juror could determine that Stillwell's entry upon and taking possession of the property in mid-June, and then discarding and burning Plaintiffs' property, indicates coercion, intimidation, threat, or interference prohibited by § 3617.") Additionally, non-landlords are liable under the FHA and such entities that "make housing unavailable," through such activities as intimidation, have been found to violate the FHA in the Fourth Circuit. *See Williams v. Poretsky Mgmt.*, 955 F. Supp. 490, 495 (D. Md. 1996) ("reviewing these cases, few as they may be, it is not difficult to conclude that this court should recognize sexual harassment as actionable under Title VIII [i.e. the FHA]"). In light of this clear precedent supporting the application of the FHA to a racially motivated arson, the Court believes there is a cognizable basis to conclude the FHA applies to this case. Accordingly, the Court will deny summary judgment to Individual Defendants Speed, Everhart, and McCann as to the applicability of the FHA.

**4.   <u>CONCLUSION</u>**

As indicated at the start of this Memorandum Opinion, the arguments presented in the parties' summary judgment motions pose novel and complex civil litigation issues surrounding this highly publicized mass arson case which wreaked havoc on the Hunters Brooke Development in Charles County, Maryland, back in December of 2004. The Court recognizes that its determinations with respect to the motions have altered the scope of the suit, particularly with respect to Corporate Defendants. First, because there is no basis on which to hold SSA Inc.'s parent company, ABM, or its predecessor, SSA, LLC, liable for the actions of SSA, Inc. or its employees, the Court has dismissed those corporate entities from the suit. Next, turning to the theories of Corporate Defendants' direct liability, because there is no dispute of material fact that the Plaintiffs were merely incidental beneficiaries of the contract between SSA, Inc. and the

Developer, the Court has granted summary judgment to Corporate Defendants on the breach of

contract claim (Count VIII). The other claims based on direct liability—negligence in hiring,

training, and supervision (Count V) and negligence (Count VI)—were denied summary

judgment at this stage because issues of material fact remain pending completion of the limited

discovery that Judge Day ordered. The remaining Counts hinged, in part, on a determination of

SSA, Inc.'s vicarious liability for the tortious acts of the Hunters Brooke guards, Speed and

Fitzpatrick. The Court found that as a matter of law, Corporate Defendants are not liable for

Speed's preparation for arson, but that issues of material fact remain with respect to their liability

for Fitzpatrick's early departure from his post. Because neither SSA, Inc. nor any employee

acting within the scope of employment acted with the necessary intent or racial animus, and no

other basis for vicarious liability applies, the Court granted Corporate Defendants summary

judgment on the Fair Housing Act claim (Count I), the claim for violation of 42 U.S.C. § 1982

(Count III), the 42 U.S.C. § 1985(3) claim (Count IV), the tortious interference with contract

claim (Count IX), and the intentional infliction of emotional distress claim (Count X). Regarding

the parties' cross-motions for summary judgment on the issue of Corporate Defendants' liability

under the Maryland Business Occupations Code (Count VII), the Court construed the statute,

which has never before been interpreted by Maryland courts, to codify common law vicarious

liability principles. Thus the Maryland Business Occupations and Professions Code claim

remains against Corporate Defendants insofar as they are vicariously liable for Fitzpatrick's

departure.

Finally, the Court denied the Individual Defendants' motions for summary judgment. The

Court believes that a 42 U.S.C. § 1985(3) claim (Count IV ) can be based on a violation of  §

1982, that there are disputes of material facts as to Plaintiffs' tortious interference with contract

claim (Count IX), and sufficient evidence of severity of Plaintiffs' injury to raise a dispute of

material fact regarding the intentional infliction of emotional distress claim (Count X).

Additionally, the Court found that Plaintiffs had shown sufficient evidence to raise a dispute of

material fact as to whether the Individual Defendants' behavior was racially motivated, and thus

denied Defendants McCann, Everhart, and Speed's motions for summary judgment on the FHA

claim (Count I), the 42 U.S.C. § 1982 claim (Count III), and the 42 U.S.C. Section 1985(3) claim

(Count IV).

     For the foregoing reasons, the Court will grant in part and deny in part Corporate

Defendants' Motion for Summary Judgment, deny Plaintiffs' Cross Motion for Partial Summary

Judgment, deny Defendant Patrick Stephen Walsh's Motion for Summary Judgment, deny

Defendant Jeremy Daniel Parady's Motion for Partial Summary Judgment, deny Defendant

Michael Everhart's Motion for Partial Summary Judgment, deny Defendant Aaron Lee Speed,

Sr.'s Motion for Summary Judgment, and deny Defendant Roy T. McCann's Motion for Partial

Summary Judgment. A separate Order will follow.

     March 31, 2010                                         /s/
          Date                                      Alexander Williams, Jr.
                                   United States District Judge