# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)

| | |
|---|---|
| JOSEPH ANTONIO, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. AW-05-2982 |
| ) | |
| SECURITY SERVICES OF AMERICA, LLC, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF WILLIAM FITZPATRICK

The undersigned, William Fitzpatrick, to the best of his knowledge, information and belief, affirms, deposes and states as follows:

1.  I am over the age of eighteen years. I have personal knowledge of the facts stated in this Declaration.

2.  I reside currently at 658 Prospect St., Leavenworth, Kansas 66048.

3.  From approximately May 2004 until January 2005, I was employed as a security guard by Security Services of America in Maryland.

4.  When I worked for Security Services of America, I met Aaron Speed, who was also working as a security guard for Security Services of America. When working, Aaron Speed acted in a way that I thought was reckless and inappropriate. I recall him telling stories to co-workers about kids throwing bottle rockets at him while on duty that I believed were lies. I also recall that he frequently would call for backup support in response to situations that arose on the job in which it was clear no backup support was necessary. It was clear to me that Aaron Speed engaged in this behavior to attract attention to himself.

5.  I am also aware that Aaron Speed had left his post early several times without informing anyone, which made his supervisor Brad Messick angry. I am aware that Brad Messick talked to Aaron Speed about his pattern of leaving early.

6.  I was also told by an FBI agent that Aaron Speed had a prior record for arson when he was a juvenile.

7.  When I applied for a security guard position with Security Services of America in the Spring of 2004, the person who I spoke to and who accepted my application was Dale



Crouch. I did not speak to any other Security Services of America employee prior to being hired by the Company.

8. The last grade of school I completed was the Sixth grade. I noted this fact on my employment application for Security Services of America. I have not received a GED or other equivalent of a high school diploma. I had no prior experience working as a security guard.

9. Throughout my life, I have experienced severe difficulties reading and writing. Managers and supervisors of Security Services of America were aware that I could not read or write beyond a very basic level. While employed by Security Services of America, co-workers and superiors often helped fill out forms for me, including incident reports.

10. Security Services of America did not give me any formal job training, such as classroom training, computer training, or tests or quizzes about my job responsibilities and the Company's procedures. I was never provided by Security Services of America with a copy of a security guard handbook or any other type of employee manual. Security Services of America did not require me to check-in regularly (other than a Nextel two-way communication once at the start of a shift and once at the end) with a supervisor or command post while I was on duty at a site without a supervisor present (Hunter's Brooke did not have a supervisor present). My training at the Hunter's Brooke post consisted of a quick walk through the site and a brief discussion of where I was supposed to patrol; this training lasted less than 30 minutes.

11. Beginning in November 2004, I began working occasional shifts for Security Services of America at the post at the Hunter's Brooke development located in Charles County, Maryland.

12. On the night of the fires, I was on duty for Security Services of America at the Hunter's Brooke development. This was my last time on duty at the Hunter's Brooke site, as I found out a few hours after my shift that the neighborhood caught fire. I later found out, through law enforcement authorities, that the fires were intentionally set by several individuals, including Aaron Speed.

13. On the night of the fires, I was scheduled to work until 5:00 am. During the beginning part of my shift, Security Services of America employee Brad Messick, my on-duty supervisor, said I could leave my post at 4:30 am, which would allow me to drop off my equipment at the office by 5:00 am. However, I left my post and the Hunter's Brooke site more than 30 minutes prior to 4:30 am. I was feeling sick that evening and had been attempting to contact Brad Messick to let him know I would be leaving earlier so he could get someone to finish my shift. Despite several attempts to call Brad Messick, I could not contact him because his phone was turned off or was broken.

14. I spoke with Aaron Speed that morning on the telephone at about 3:00 am. I told Aaron Speed, who knew I was sick, that I needed to contact Brad Messick, but he did not know where Brad Messick was. I was not aware of any other Security Services of America supervisor or manager that I could call. I had not been informed by Security Services of America about the Company's policy and procedures for leaving early in case of illness. Therefore, I left the site prior to 4:00 am without informing my supervisors prior to leaving.



2

15. Had I been present at the site at the time and seen anyone entering the Hunter's Brooke development, I would have called the police. Had I been present at the site at the time and seen any fire in the development, I would have immediately called the fire department to alert them about the fires.

16. Sometime between 5:00 am and 6:00 am on the morning of the fires, I received a call from Aaron Speed, who told me that the Hunter's Brooke development site was on fire. Soon after speaking with Aaron Speed, I then heard about the fire on a police scanner I owned when a dispatch went over the air announcing a fire at Hunter's Brooke.

17. Shortly after that call, I received a phonecall from Anne Lee and Brandi Grafton, another Security Services of America manager, who also told me about the fires. Anne Lee told me not to go down to the Hunter's Brooke site and instructed me not to talk to anyone about the fire or the site. She said she wanted to talk to me very soon and she asked me to meet her and Brandi Grafton at a local restaurant in Waldorf that morning.

18. At the restaurant that morning of the fires, Anne Lee asked me to lie and tell law enforcement authorities that I was on duty throughout my entire scheduled shift. They provided me with a daily log for that shift that was already filled out which incorrectly noted that I was at the Hunter's Brooke site when in fact I had already left. When I was initially interviewed by federal agents (either from the FBI or ATF), Anne Lee was present during the conversation so I repeated her lie that I was present for my entire shift. During a later interview, I informed the federal agents that this story was not true, that Anne Lee asked me to lie, and that I had left my post well before my shift was scheduled to conclude.

19. Although I have had medical issues since I left Security Services of America, I remember clearly the facts described above. Although I cannot read, each of these statements was read aloud to me by my sister, Mary Beck. I confirmed that each of these statements is true and correct.

20. I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 12, 2008.

_____
William Fitzpatrick, Declarant

21. I have reviewed this declaration with my brother, William Fitzpatrick, and he has indicated to me that he understands its contents and that it is accurate.

_____
Mary Beck, Sister of Declarant

3